WESTERN UNION TELEGRAPH COMPANY, APPELLANT, VS. HYER BROS., APPELLEES.

1. When a telegram is delivered to an operator, employed by a telegraph company, for transmission and delivery to the person to whom it is addressed, and the consideration for said service is paid to and accepted by such operator, the law enjoins on such company prompt and skillful performance of their undertaking.

2. If a telegraph company, to whom a telegram has been delivered, as above, fail to transmit or to deliver the same to the person to whom it is addressed, within a reasonable time, such company is responsible for such failure, to the person injured, whether he be the sender or the person indicated in such telegram as the one to whom it was to be sent, for such damages as are proximate and reasonable and naturally result from such failure.

3. It is no defence for said company, when sued for failure to transmit and deliver a telegram, as above, that the sender did not inform them or their operator of its importance, when they fail to show that if they or their operator had received such information, it would in any respect have changed the method of its transmission, or the time in which it was to be sent, the agency employed, the price demanded therefor, or the degree of skill used in its transmission.

**638** SUPREME COURT.

Western Union Telegraph Co. v. Hyer Bros.—Argument of Counsel.

4. Nor is it any defence of said company that such message is in cipher or words, the meaning of which the operator does not know; provided, such message is plainly written and the words therein are in the letters of the English alphabet.

5. The appellees, ship brokers, residing in Pensacola, having been engaged by a customer to charter a vessel to carry a cargo of lumber from Pensacola to the United Kingdom, sent a telegram to their correspondent in Barbadoes, making an offer for the charter of a vessel, the offer was accepted and a telegram sent appellees, which was received at the defendant company's office in Pensacola the next day, but which was never delivered to appellees. Their correspondent in Barbadoes, as their agent, signed the usual charter party for appellees. Not receiving an answer to their dispatch they told their customer that they had failed to charter the vessel, whereupon he chartered another. Two weeks afterwards the vessel came to Pensacola, as per the charter party signed by their agent in Barbadoes. They were compelled to re-charter it at a loss; *Held*, That the telegraph company was responsible to them for such loss and for their time and exertions in re-chartering such vessel.

RANEY, J., dissenting, holds that the only damages recoverable are the charges paid for the telegram, as it was in cipher, and its subject matter, or importance, was not known by, or communicated to, the company or the operator.

Appeal from the Circuit Court for Escambia county.

The facts of the case are stated in the opinion.

*W. A. Blount* for Appellant.

The only question is as to the measure of damages. The appellant contends that the telegram, being in cipher, there were no damages in contemplation of the parties, and that the court erred in rendering judgment for other than nominal damages. I cite: Baldwin vs. U. S. Tel. Co., 45 N. Y., 744; Landsberger vs. Magnetic Tel. Co., 32 Barb., 530; McCall vs. U. S. Tel. Co., 44 N. Y., Supreme Court, 487; U. S. Tel. Co. vs. Gildersleeve, 29 Md., 232; Condee vs. W. U. Tel. Co., 34 Wis., 471; Beaupie vs. Pa

cific Tel. Co., 21 Minn., 156 ; Dargan vs. W. U. Tel. Co.,
U. S. Circuit Ct., So. Dist. Ala., 1874 ; I. L. R. C. P. Div.,
326 ; 45 L. J. C. P. Div., 682 ; Saunders vs. Stewart, 35
L. T., (N. S.,) 370.

*S. R. Mallory* for Appellees.

The question presented to this court is as to the correct-
ness of the judgment of the court below in holding that
anything more than the price of the telegram, if that, can
be recovered from the telegraph company because of its fail-
ure to deliver a telegram unintelligible to the telegraph
company or its agents.   No question of *vis major* is involved,
the company admitting that it received the telegram at
Pensacola on September 14th, and offering no excuse for
failing to deliver it.

I am aware of the many cases that may be cited as de-
claring that the rule enunciated in Hadley vs. Baxendale
applies in all its strictness to cases of this kind, and I know
that courts of weight and authority in this country have
held, in cases of cipher and unintelligible telegraph mes-
sages, that telegraph companies could not be held responsi-
ble for damages arising out of the non-delivery thereof ;
the reason of these decisions being based on the inability of
the defendant companies to understand the import of the
messages, and the consequent impossibility of their having
contemplated the damages claimed.

In the case of Daughtry vs. American Union Telegraph
Company, decided by the Supreme Court of Alabama at its
December term, 1883, a case in which this question was
fairly presented to the court, Stone, J., delivered the opin-
ion of the court, and after a very clear and exhaustive re-
view of Hadley vs. Baxendale, and the telegraph cases that
have heretofore been decided thereunder, declares it to be

640 SUPREME COURT.

Western Union Telegraph Co. v. Hyer Bros.—Argument of Counsel.

the opinion of Alabama's Supreme Court " *that the liability of the telegraph company does not depend on the knowledge the operator may have of the contents of the message.*" While admitting the applicability of the language of the court in Hadley vs. Baxendale to that case, a case in which there existed special circumstances, of which defendant knew nothing, and could have known nothing without plaintiff's aid, Judge Stone denies that it can be invoked to qualify the liability of corporations to which are daily entrusted, for transmission and delivery, messages which set in motion the business and commerce of the world, and on the prompt and faithful delivery of which are dependent the welfare of millions of people and the security of hundreds of millions of dollars. The iron shaft, in Hadley vs. Baxendale, of itself conveyed to the carrier no intimation of the emergency in which its owner had been placed. It differed in no respect from other refuse iron destined for the scrap-pile of some machine shop, which the carrier's business had often required him, before that, to transport to its destination, and the rule enunciated in that case had reference to those facts.

Is it not the blindest of blind following of precedent to say at this day that the failure of a telegraph company to deliver a message committed to it for transmission and delivery, is to be gauged by the same standard? That the receipt of a message by such a company is no more suggestive of the necessity of expedition *and accuracy* in transmission and delivery than was the receipt, by the carrier, of the iron shaft in Hadley vs. Baxendale? Must the sound rule, that the measure of damages for the breach of contract is what may fairly and reasonably be considered as arising naturally and proximately from such breach, to be forever, in all cases, subordinated to the rule prescribed in Hadley vs. Baxendale for cases specially circumstanced?

The reasoning of the court in Daughtry vs. American Union Telegraph Co., while opposed to the great majority of decisions on the subject, will, I think, nevertheless commend itself to the judgment of this court as possessing characteristics not revealed by the reasoning in the cases to which it is opposed. It is both logical and just, and if adhered to will secure courts, at least, from a continuance on the line of the " very many erroneous rulings " to which Judge Stone refers. The question is, I believe, a new one in this court, and in confining my citation to the decision of Alabama's Supreme Court I rely upon the law as opposed to precedent.

THE CHIEF-JUSTICE delivered the opinion of the court:

Suit was brought by Hyer Bros. in the Circuit Court of Escambia county against the Western Union Telegraph Company for damages for non-delivery of a cablegram sent to them at Pensacola by their correspondent and agent at Barbadoes.

The proof showed that the plaintiffs were merchants and ship brokers at Pensacola, and that on the 12th day of September, 1883, they received a cablegram from their correspondent and agent at Barbadoes, as follows: " Prelate, Tellespont, lambent, speculum, divan, extol, pulpit, rabidy, Greenock, preferred, sluggard, excluded, stevedore, 'scam,' ' slum,' " which being translated meant: " We grant you refusal for 24 hours. Tellespont, 556 6-100 reg., half hewn, balance deals, £6.15, full freight on beam fillings. U. K., Greenock preferred, £20 gratuity, stevedore excluded. Commissions in thirds." Hyer Bros. answered the cablegram as follows: " To Laurie, Barbadoes. Wagon, extant, knight, sluggard, polygon," which being translated

41

meant: "For United Kingdom, full cargo sawn timber at £6.10s per standard, and £20 gratuity, usual charter."

The agent at Barbadoes answered this dispatch and the answer was received at the office of the Western Union Telegraph Co., in Pensacola, Sept. 14. It contained but one word, "Punctual." By the cipher code used by Hyer Bros., and their correspondent it meant: "We have closed the vessel as per your telegram." It was never delivered to Hyer Bros. The offer of H. B. for the charter of the vessel was based on an offer made to them by A. M. McMillan, of Pensacola.

Not receiving an answer to their dispatch and thinking their offer was not accepted they told McMillan that the offer was declined and he secured another vessel. On October 2d the vessel arrived at Pensacola, bringing a letter from their agent at Barbadoes containing a copy of the telegram, which had been sent as aforesaid to H. B., but not delivered; also, a charter party which their agent at Barbadoes had signed for them in accordance with their offer. They had to re-charter the vessel at a loss.

The court instructed the jury to find their verdict as a special verdict upon which, if in favor of the plaintiff, it should enter judgment for nominal damages or for the amount of damages as found by the jury as it might thereafter be advised. The jury returned a verdict for plaintiffs for $618.90, and the said court, after being advised, entered judgment in favor of the plaintiffs and against the defendant for said sum.

The defendant alleges here as error that the court erred in rendering judgment for other than nominal damages.

This question has never before been presented for adjudication in this State.

The courts in New York, Minnesota, Maryland, Wisconsin, Massachusetts, Nevada and Maine, following the case

of Hadley vs. Baxendale, 9 Ex. 341, hold that only nominal damages can be recovered from the company undertaking to send the telegram, unless the sender should inform the operator of the special circumstances which constituted its importance and the need of its correct and prompt transmission. The case of Hadley vs. Baxendale, *supra*, was this: The plaintiffs, owners of a steam mill at Gloucester, had a shaft broken, and desiring to have another made they left the broken shaft with the defendant, a common carrier, to be carried to a foundry at Greenwich to serve as a model for a new one. At the time of making the contract the defendant's clerk was informed that the mill was stopped, and that the plaintiffs desired the broken shaft to be sent immediately, but were not informed of the special purpose for which the broken shaft was to be forwarded. The carriers told the proprietors of the mill that they could deliver the shaft at Greenwich at a certain time. They failed to deliver it within the time, and a delay was caused in the making of a new one, and a consequent delay in starting the mill. The court said: " We think the proper rule in such a case as the present is this : where two parties have made a contract which one of them has broken, the damages which the other party ought to receive in respect of such breach of contract should be either such as may fairly and substantially be considered as arising naturally, *i. e.*, according to the usual course of things, from such breach of contract itself, or such as may reasonably be supposed to have been in the contemplation of both parties at the time they made the contract, as the probable result of the breach of it. Now, if the special circumstances under which the contract was actually made were communicated by the plaintiff to the defendant, and thus known to both parties, the damages resulting from the breach of such a contract which they would reasonably contemplate

would be the amount of injury which would ordinarily follow from a breach of contract under these special circumstances so known and communicated. But, on the other hand, if those special circumstances were wholly unknown to the party breaking the contract, he, at the most, could only be supposed to have had in his contemplation the amount of injury which would arise generally, and in the great multitude of cases not affected by any special circumstances, for such a breach of contract. For had the special circumstances been known, the parties might have expressly provided for the breach of contract by special terms as to the damage in that case, and of this advantage it would be very unjust to deprive them. The above principles are those by which we think the jury ought to be guided in estimating the damages arising out of any breach of contract."

All the cases above referred to rely upon the authority of this case of Hadley vs. Baxendale, and are decided upon the theory that the principles of law regulating the conduct of common carriers applies equally to the transmission of messages by the electric telegraph system. The business of one is to transport from one locality to another some tangible object of weight and dimension. Experience does not suggest in such a transaction any other liability than compensation for its value if lost or destroyed in the transportation, or such damages for its delay as the object itself might suggest. The business of the other is the transmission from one to another and from one locality to another, of information or intelligence, nothing in itself, but as the basis and ground work that is to influence the conduct of others, is in this respect of the very first importance. One is limited to the transportation of tangible things, the other to the transmission of the intangible. There is no similarity in the services to be performed, in the nature of the

things to be transported or transmitted, or the purposes to be effected, and as a consequence none as to the measure of damages for failure to perform their respective agreements.

The decision in Hadley vs. Baxendale was proper and suited to the facts before the court, but an attempt to extend it to such cases as this would be productive of great injustice. The telegraphic invention has made the system the means of communication between all civilized countries on the globe for a large part of the transactions and communications that prior to its invention were conducted by writing or by special messenger. No man can enumerate the vast number of subjects of treaty and intercourse that the complicated relations of mankind require its agency to accomplish. It can safely be said, however, that the larger part of all messages sent are of a commercial or business nature which suggest value; the requirements of friendship or pleasure can await other means of less celerity and less expense. If this be true, why should the law assume that as a rule all messages sent over it are unimportant, and that an important one is an exception, of which the operator is to be informed? Whatever may be the rules of this particular defendant company, if they have any, there are none set forth in the record; whether, therefore, its rules are reasonable or whether it can limit its liability by proper rules when shown to have been known to its patron, is in no sense involved in this opinion.

The common carrier charges different rates of freight for different articles according to their bulk and value and their respective risks of transportation, and provides different methods for the transportation of each. It is not shown here that the defendant company had any scale of prices which were higher or lower as the importance of the dispatch was great or small. It cannot be said, then, that

for this reason the operator should be informed of its importance, when it made no difference in the charge of transmission. It is not shown that if its importance had been disclosed to the operator that he was required by the rules of the company to send the message out of the order in which it came to the office, with reference to other messages awaiting transmission, that he was to use any extra degree of skill, any different method or agency for sending it, from the time, the skill used, the agencies employed, or the compensation demanded, for sending an unimportant dispatch, or that it would aid the operator in its transmission. For what reason, then, could he demand information that was in no way whatever to affect his manner of action or impose on him any additional obligation? It could only operate on him persuasively to perform a duty for which he had been paid the price he demanded, which in consideration thereof he had agreed to perform, and which the law in consideration of his promise and the reception of the consideration therefor had already enjoined on him. The system of telegraphy, founded as it is on a comparatively recent discovery of the practical capabilities of a well known elementary force, whose existence had hitherto made itself known more by its power of destruction and the dread of its visitations than by manifesting utility for the varied purposes of man, and having for its mission the almost instantaneous communication of ideas between persons widely separated, as to distance, unlike any industry or enterprise that had ever been in use before, may justly be considered and treated as standing alone a system unto itself.

The nearest approach to any similar enterprise is the system of carrying letters by mail, but as this has been taken in charge and performed by the United States Government since its inception, and its acts or omissions cannot be made

subjects of judicial inquiry, we can find no precedent in this country to aid in the solution of the questions that are dividing the courts. The same may be said as to want of precedents in that country to which we have so often and so successfully looked for assistance in other disputed questions. Prior to the reign of James I, when the post was first established in England, letters were sent by a messenger specially hired for the purpose, or intrusted to the honor of some wayfarer who chanced to be going to the place where the letter was desired to be sent. Butchers and drovers whose business of buying cattle caused them to visit various parts of the kingdom were the principal carriers of letters, as late as the 15th century. Any attempt to apply to such a novel system legal principles adapted to pursuits and occupations which are dissimilar in their nature, and designed for the accomplishment of different purposes, must naturally result in failure and confusion. A recognition by the courts of this truth, and an application from time to time to its conduct of such rules and regulations as common sense may suggest, as fitted to its peculiar nature and purposes, without reference to systems that are not similar and principles that are not analogous, is the only method preserving the law regulating its operation from contradictions and perplexities. Similar difficulties have previously arisen in other branches of the law when from their novelty and a failure of applicable precedents, the courts, probably from fear of the hazard of framing new rules, or misled by a seeming analogy, have attempted to apply to such legal novelties long used principles of law, and to analogize the new to some old system with which they were familiar. This disposition of the courts, or it may be said of the human mind, for it exists equally elsewhere, is very forcibly and conclusively shown in the effort, when the tenure of partners in the

joint property of the partnership was a new question in the English courts, to liken it to a joint tenancy or a tenancy in common. This was the view, says Mr. Parsons, that was taken in all the early books. They all had the element of joint ownership of property, but in all other respects were different and independent, and the law for each should be sought for in itself. When this species of joint interest and ownership came under the cognizance of the courts of England it was new to them, and new to the law of England, and it was perhaps unavoidable that they who administered the law should have sought to bring this new topic within the rules and principles of these kinds of joint ownership which were well known. Parsons on Partnership, pp. 2 and 3. Much of the confusion, says the same learned author, existing to-day in suits and levies of a private creditor against a partner personally indebted to him is due to the inability of the law of partnership to clear itself of the last remaining influences of the old notion that partnership was but one form of tenancy in common. Ib., 352 and 353.

The Supreme Court of Alabama, in the case of Daughtry vs. American Union Telegraph Company, at its December term, 1883, reported in the Alabama Law Journal, May 1884, 75 Ala., 168, and the Supreme Court of California, in the case of Hart vs. Western Union Telegraph Co., April term, 1885, 66 Cal., 579, have laid down a doctrine more harmonious with justice, and more applicable to the peculiar characteristics belonging to the system of telegraphy. They hold that a telegraph company is liable for damage resulting naturally, and in the usual course of business, from its failure to send or deliver a dispatch correctly and promptly without requiring the sender to disclose its importance to the company or its agent.

It is of no consequence whether the dispatch is in plain

English or in cipher, provided such cipher is written in the letters of the English alphabet.

The judgment of the Circuit Court is affirmed.

Mr. Justice Raney delivered the following dissenting opinion:

I am unable to agree with the conclusion reached by the other members of the court in this case. The question is one of the measure of damages, not of the right of recovery. The rule advanced in Hadley *et al.* vs. Baxendale, 26 E. L. & E., 398, is that the damages should be such as may fairly and substantially be considered as arising naturally, *i. e.*, according to the natural course of things, from such breach of contract itself, or such as may reasonably be supposed to have been in the contemplation of both parties, at the time they made the contract, as the probable result of it. The defendant's clerk was informed that the mill was stopped and that the plaintiffs desired the broken shaft to be sent immediately, but was not informed of the special purpose for which the broken shaft was to be forwarded, or rather also the special circumstances under which it was being sent, viz: that it was essential to the running of the mill to have a new shaft. It was held by the Exchequer that damages for the loss of profits incurred by the stoppage of the mill through defendant's delay did not arise in the natural course of things from the breach of contract in not delivering the pieces of the broken shaft in a reasonable time, under the communications made to defendant's clerk. It is contended that this rule in Hadley vs. Baxendale is not applicable to a case like the one now before us; and it is said that the business of a common carrier is to transport from one locality to another some tangible object of weight and dimension; that compensation for its value,

if lost or destroyed in transportation, or such damage for its delay as the object itself might suggest, is the only liability experience would suggest; that the business of the telegraph company is the transmission from one person to another, and from one locality to another, of information or intelligence, nothing or intangible in itself, but as the basis and ground work that is to influence the conduct of others; that there is no similarity in the services to be performed, or in the nature of the things to be transported or transmitted or the purposes to be effected, and, as a consequence, none as to the measure of damages for failure to perform their respective agreements. It does seem to me that experience has suggested some other liability in the case of the common carrier than compensation for the value of the lost or destroyed article, and some other damage for delay than the object itself might suggest; this liability or damage is that where there are special circumstances from which there would, in case of a breach, ordinarily follow or naturally result to the plaintiff a greater damage than the object itself would suggest; and in such cases they should be held liable for the damage naturally flowing from such special circumstances in the event they were communicated to the carrier when the contract was entered into. This rule of Hadley vs. Baxendale is founded upon and is the expression of that which experience had suggested. It is a rule to cover such damages as the " object " itself did not suggest in case of delay, and it declares that such damage shall not be recovered on the one hand, or borne and paid on the other, unless the special circumstances from which it would naturally, ordinarily or in the usual course of things, result, are communicated to the carrier; when they are communicated the damages are within the contemplation of the parties *in law*, whether so in *fact* or not. This is an eminently just rule and I am unable to see why it is

not as applicable to the contract of a telegraph company as to a common carrier of tangible objects. Why should the measure of damages be in the one case what the known subject matter alone, or the known subject matter and special circumstances communicated, naturally suggest as likely to follow from a breach, and in the other be what would naturally result from the breach whether the subject matter suggested the damage or not. The purpose of requiring a communication of the special circumstances in order to recover damages other than the subject of the contract may suggest, is to enable the carrier to perceive or contemplate such damages and to provide against them if he desire, and even if he does not so desire, to acquaint him with the responsibilities of his undertaking, and thus in effect to relieve him from any responsibility greater or other than he has seemed by the nature and terms of the contract to undertake. Why is not this a just rule for the telegraph company ? Do not such companies transmit messages varying as much in value as do the commodities conveyed by railroad companies ? Why should not they as well as any other party be entitled to know what is involved in their contract, and be liable for no more than appears to be ? The doctrine of the opinion of the majority of this court establishes a principle heretofore unknown, (but for the Alabama case and possibly one in California) in the history of the law, viz: imposing upon a party an amount of damage which neither the subject matter or terms of the contract as they appear upon their face to him, and to every other person in the world, suggest. It cannot be maintained that an intelligible telegram does not suggest to the telegraph company, or in other words, to its agent, both its subject matter, and the damages which would naturally and proximately result from the breach of the contract to transmit and deliver, as much as the sight or description of

a tangible object suggests its nature and the damages which may so arise from the breach of contract to convey and deliver it. Consider these telegrams as they appear on their face without the aid of the "key," and the contract to convey and deliver them as alleged in the declaration, and who can tell what damage would naturally, proximately and reasonably result from any failure of the telegraph company to deliver, other than the cost of transmissal and delivery? In Sanders vs. Stuart, 1 C. P. D., 326, (see p. 225-6, 1st Vol. Sedgwick on Damages,) the defendant's business was to collect telegraphic messages for transmission to America, and the plaintiff gave him a message in cipher which he negligently failed to send. The message was an order for goods on which the plaintiff would have made a commission, and it was held that he could not recover the commission, but only nominal damages, and Coleridge, C. J., said that there were no damages which were in the contemplation of the parties; " and," he continued, " for the same reason, viz: the total ignorance of the defendant as to the subject matter of the contract (an ignorance known to and intentionally procured by the plaintiff,) the first portion of the rule applies also," for, said he, there were no damages arising naturally from the breach. In the opinion in Daniel vs. W. U. Tel. Co., 61, Texas, 457, we find the following from 6th Wait's Actions and Defences, 19 : " Where the import of a telegraphic message to whom it is delivered is wholly unknown to the company's agent, it cannot be assumed that he had in view any pecuniary loss as the natural or probable result of a failure to send such message, and in such case, upon a breach of the contract to transmit and deliver, the sender can recover only nominal damages or the amount paid for sending the message."

The rule advanced by the other justices of this court bases the measure of damages, in case of breach, not upon

the known subject matter of the contract, and its terms as they appear to the contracting minds, and which contracting minds have never assented to any other subject matter than what appears on the face of the telegram, but upon a subject matter which a hidden meaning of the terms used may happen to disclose. The rule strikes me as neither wise nor just. The fact that upon a disclosure to the telegraph company, or its agent, of the subject matter or meaning of the telegram, neither the method of transmission, nor the time in which it was to be sent, nor the agency employed, nor the price demanded, nor the degree of skill used in transmission would have been changed, is no justification for imposing upon a telegraph company, or other defendant, a measure of damages which the subject matter of the contract, as such subject matter is made to appear by the plaintiff, does not naturally suggest. The rule that requires the sender of the telegram to communicate its subject matter and importance to the telegraph company before it can be made liable for damages naturally flowing from a breach of it, is, I believe, wiser and in every way more just, and has been fully and very uniformly sustained by the American and English courts as applicable to telegraph contracts. Sutherland on the Law of Damages, Vol. 3, pp. 298, 299 and cases cited; 6 Wait's Actions and Defences, p. 19, and cases cited; Daniel vs. W. U. Tel. Co., 61 Texas, 452, and cases cited; Sanders vs. Stewart, Jacob's Fisher's Digest, Vol. 3, p. 12,911.